**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **No. 25 CR 773** |
| | ) | |
| | ) | **Hon. Jorge Alonso** |
| **LUIS URIBE** | ) | |

**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE OR, IN THE ALTERNATIVE, FOR DISCLOSURE OF GRAND JURY MATERIALS AND AN EVIDENTIARY HEARING**

**TABLE OF CONTENTS**

I. INTRODUCTION ..........1

II. LEGAL STANDARD ..........8

III. ARGUMENT ..........13

A. The Indictment Should Be Dismissed Because the AUSA's Misconduct Compromised the Independence of the Special June 2024 Grand Jury and Creates Grave Doubt That the Uribe Indictment Was Free From Its Substantial Influence ..........13

B. Uribe Has Suffered Prejudice ..........15

C. Dismissal with Prejudice is Warranted by the Widespread Misconduct ..........16

IV. In the Alternative, the Court Should Order Disclosure of the Grand Jury Materials in the Investigation that Led to the Indictment Here, All Records of AUSA A's Grand Juror Interactions Before the Special June 2024 Grand Jury, as well as the Results of the Phase II Remediation Plan and Conduct an Evidentiary Hearing ..........17

V. In the Further Alternative, the Court Should Also Hold an Evidentiary Hearing ..........19

VI. CONCLUSION ..........20

## TABLE OF AUTHORITIES

### CASES


Bank of Nova Scotia v. United States, 487 U.S. 250 (1988) .......................... 10, 11, 15-19

Berger v. United States, 295 U.S. 78 (1935) .......................... 8, 9

Douglas Oil Co. v. Petrol Stops Nw., 441 U.S. 211 (1979) .......................... 17

Stirone v. United States, 361 U.S. 212 (1960) .......................... 13

United States v. Abbott Laboratories, 369 F. Supp. 1396 (E.D.N.C. 1973) .......................... 9

United States v. Ahmed, No. 25 CR 321 (N.D. Ill.) .......................... 2, 3, 6

United States v. Anderson, 61 F.3d 1290 (7th Cir. 1995) .......................... 10, 15

United States v. Breslin, 916 F. Supp. 438 (E.D. Pa. 1996) .......................... 9

United States v. Brito, 907 F.2d 392 (2d Cir. 1990) .......................... 12

United States v. Bundy, 968 F.3d 1019 (9th Cir. 2020) .......................... 12

United States v. Cederquist, 641 F.2d 1347 (9th Cir. 1981) .......................... 13

United States v. Cerullo, 2007 WL 2462111 (S.D. Cal. Aug. 28, 2007) .......................... 10

United States v. Chapman, 524 F.3d 1073 (9th Cir. 2008) .......................... 12

United States v. Comey, No. 1:25-cr-272 (E.D. Va.) .......................... 18

United States v. Derrick, 163 F.3d 799 (4th Cir. 1998) .......................... 11

United States v. DiGrazia, 213 F. Supp. 232 (N.D. Ill. 1963) .......................... 8, 9

United States v. Dionisio, 410 U.S. 1 (1973) .......................... 8

United States v. Estepa, 471 F.2d 1132 (2d Cir. 1972) .......................... 10

United States v. Felton, 755 F. Supp. 72 (S.D.N.Y. 1991) .......................... 12

United States v. Filer, No. 19-cr-00565 (N.D. Ill. Jan. 14, 2025) .......................... 10, 13, 14

United States v. Gold, 470 F. Supp. 1336 (N.D. Ill. 1979) .......................... 9

United States v. Hodge, 496 F.2d 87 (5th Cir. 1974) .......................... 9, 14

United States v. Hogan, 712 F.2d 757 (2d Cir. 1983) ....................9

United States v. Ishkirat, No. 25 CR 562 (N.D. Ill.)....................2, 4, 5, 19

United States v. Leeper, No. 06-CR-58A, 2006 WL 1455485 (W.D.N.Y. May 22, 2006) ....................9

United States v. Linder, 2013 WL 812382 (N.D. Ill. 2013) ....................11

United States v. McKenzie, 678 F.2d 629 (5th Cir. 1982) ....................13

United States v. Mechanik, 475 U.S. 66 (1986) ....................11, 15

United States v. Navarro, 608 F.3d 529 (9th Cir. 2010)....................15

United States v. Owen, 580 F.2d 365 (9th Cir. 1978) ....................11

United States v. Percoco, 13 F.4th 158 (2d Cir. 2021) ....................12

United States v. Puglia, 8 F.3d 478 (9th Cir. 1993)....................17

United States v. Rabbitt, No. 25 CR 693 (N.D. Ill.) .................... passim

United States v. Robinson, 485 U.S. 25 (1988)....................9

United States v. Samango, 607 F.2d 877 (9th Cir. 1979) ....................10, 11

United States v. Schiff, No. 19-cr-474 (N.D. Ill.)....................2

United States v. Serubo, 604 F.2d 807 (3d Cir. 1979)....................8, 14, 16

United States v. Slough, 679 F. Supp. 2d 55 (D.D.C. 2010) ....................11

United States v. Smith, 2022 WL 1053263 (2d Cir. 2022)....................12

United States v. Stein, 541 F.3d 130 (2d Cir. 2008)....................12

United States v. Stevens, 771 F. Supp. 2d 556 (D. Md. 2011) ....................10

United States v. Udziela, 671 F.2d 995 (7th Cir. 1982)....................10

United States v. Walters, 910 F.3d 11 (2d Cir. 2018)....................10

United States v. Williams, 504 U.S. 36 (1992)....................8, 13

United States v. Young, 470 U.S. 1 (1985) ....................9

Williams v. United States, 757 A.2d 100 (D.C. 2000) ....................................................... 9

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. V ........................................................................................... 8

**RULES**

Fed. R. Crim. P. 6 .......................................................................... 9, 17, 18, 20

Fed. R. Crim. P. 6(e)(1) ........................................................................... 9, 18, 20

Fed. R. Crim. P. 6(e)(3)(E)(ii) ........................................................................... 17

**OTHER AUTHORITIES**

ABA Standards, The Prosecution Function § 3.5(b) (1971) ............................................... 9

Fed. R. Crim. P. 6(e)(1), Advisory Committee Notes to 1979 Amendments ...................... 9

What to know about the 'Broadview Six' scandal rocking Chicago's federal courthouse, Chicago Sun-Times (June 27, 2026) ............................................................... 1

NOW COMES the defendant, Luis Uribe, by and through his attorney, Michael F. Clancy, and respectfully moves this Honorable Court, pursuant to the Fifth Amendment to the United States Constitution, Federal Rule of Criminal Procedure 6, and the Court's inherent supervisory authority, to dismiss the indictment in this case with prejudice. Alternatively, Uribe moves for disclosure of the below-described grand jury materials, and for an evidentiary hearing. In support of this motion, Uribe states the following:

## I. INTRODUCTION

The following remarks were made by a federal prosecutor to Uribe's grand jury on the same afternoon a witness testified in support of an indictment against Uribe:

> Yes. This is a very interesting case. It's a little different. I purposely asked if I could wait for the Thursday grand jury. I did.
>
> [Co-counsel] will vouch for me. I said I want to go in front of the Thursday grand jury because I know you and I trust you and you know me and you trust me, and I would never ask you to charge somebody if I didn't think there was probable cause and you know you've asked me before "Well, what about this person?" And I said "I don't charge people unless I'm absolutely sure."

Tr. Special June 2024 Grand Jury, 10/9/25, at 3:11–4:1.

As this Court is undoubtedly aware, following revelations in a criminal prosecution involving protests at an ICE facility in Broadview, Illinois, evidence of similar grand jury misconduct has come to light. *See, e.g.*, What to know about the 'Broadview Six' scandal rocking Chicago's federal courthouse, Chicago Sun Times (June 27, 2026), https://chicago.suntimes.com/crime/2026/06/27/broadview-six-boutros-chicago.

Uribe's indictment was returned by the Special June 2024 Grand Jury. This is the same grand jury that returned the indictments in the following matters that have resulted in dismissals with prejudice based on Government misconduct in presenting those cases to the grand jury:

1. *United States v. Rabbitt*, *et al.,* 25 CR 693 (Judge Perry) – all charges dismissed with prejudice as to all defendants (Special June 2024 Grand Jury)
2. *United States v. Ahmed, et al.,* 25 CR 321 (Judge Coleman) – all charges dismissed with prejudice as to two defendants (Special June 2024 Grand Jury)
3. *United States v. Ishkirat*, *et al.*, 25 CR 562 (Judge Gettleman) – all charges dismissed with prejudice as to all defendants (Special June 2024 Grand Jury)

In addition, misconduct before *other* grand juries by the United States Attorney's Office has resulted in drastically reduced charges or other benefits:

4. *United States v. Ahmed, et al.,* 24 CR 232 (Judge Gettleman) – pretrial diversion agreement as to one defendant. (Special January 2023 Grand Jury)
5. *United States v. Schiff*, No. 19-cr-474 (Judge Rowland) – unopposed compassionate release for a defendant who had pled guilty to bank fraud. (Special January 2019 Grand Jury)

The full extent of the misconduct in these cases is not yet publicly available. But, based on what has been released to the public in *Rabbitt*, and what has been described generally in the *Ahmed* case before Judge Coleman, the misconduct included excusing jurors who disagreed with the government's case, improper prosecutorial communications of a substantive nature with grand jurors outside the grand jury room, and improper prosecutorial vouching by a "20-years-plus senior [Assistant U.S. Attorney] veteran." *United States v. Ahmed,* 25 CR 321, Dkt. 131, pp. 2-3 (district court summarizing the allegations of misconduct). The misconduct in the *Ahmed* grand jury investigation included eight different types of misconduct by the government: "(1) repeated personal vouching for witnesses and the strength of the government's case; (2) treatment of the indictment as a foregone conclusion and assurances about post-indictment events; (3) inflammatory characterizations of the defendants, including name-calling and folk-wisdom metaphors; (4) disclosure of extra-record information including off-the-record negotiations with a subject's counsel; (5) familiarity and rapport-building with the grand jurors that compromised their independent role; (6) disclosure of related charging decisions, including the flight of one subject

to Dubai and the prosecution of another in a related matter; (7) mischaracterizations of legal principles upon which the undersigned defendants were ultimately indicted; and (8) mischaracterization of evidence specific to the undersigned defendant in a way that compromises the integrity of the evidence." *Id*. at 3-4 (summarizing allegations).

The transcripts publicly released in the *Rabbitt* matter and the allegations from the *Ahmed* motion to dismiss establish that this misconduct was neither isolated nor of recent origin. Perhaps most importantly to the instant motion, the AUSA whose conduct in the grand jury has been primarily at issue (referred to herein as "AUSA A") began her presentation to the *Rabbitt* grand jurors on October 9, 2025, by referring to *past* misconduct before the same grand jury.

The known *Rabbitt* grand jury misconduct, which included the above statement on October 9, 2025, occurred on the same afternoon that a witness in Uribe's case testified before the same grand jury. Ultimately, Uribe's indictment was returned in December of 2025, two months after the United States Attorney's Office had indoctrinated this same grand jury. Accordingly, the indictment here should be dismissed, or the Court should require the Government to produce discovery, and then conduct an evidentiary hearing.

By way of background, the incidents at issue in this case occurred in 2022. The Schaumburg Police Department conducted an initial investigation in 2022. The Department of Homeland Security then conducted its investigation in 2023. The first witness was not brought before a grand jury until October of 2024, more than two years after the last alleged incident, and several months after the Special June 2024 Grand Jury had been seated. The first witness to testify in this investigation, Victim C, appeared before the Special June 2024 Grand Jury on October 24, 2024. The next witness, Witness A, testified on September 25, 2025. The third witness, Victim

A, testified on October 9, 2025. The final witness, Special Agent Doyle, testified on December 4, 2025.

It is uncontroverted that the United States Attorney's Office committed gross malfeasance in regard to the Special June 2024 Grand Jury. That conduct eroded the trust that normally would be placed on indictments secured by their office. As Judge Perry recognized, that trust has been broken. Due to the repeated and wide-ranging instances of prosecutorial misconduct, there can no longer be a presumption of regularity in relation to indictments procured from the Special June 2024 Grand Jury.

Here, we have grand jury testimony relating to cases involving two related organizations under the Department of Homeland Security being presented on the same fateful day: October 9, 2025. Even though the incidents involving Uribe had been over for two years, they just so happened to be introduced to what was apparently the United States Attorney' Office's favorite grand jury. One can only wonder whether there was prosecutorial gerrymandering involved to steer particular cases to a grand jury that had been groomed to indict.

Initially, the starting date of the United States Attorney's Office's improper conduct and vouching before the Special June 2024 Grand Jury, and the date (and details) of the specific acts of vouching that were referred to in the quote set forth above, are unknown. The full extent of the misconduct before the Special June 2024 Grand Jury is also unknown. The United States Attorney for the Northern District of Illinois has indicated that his office is engaging in what he calls a "Phase II Remediation Plan" described as "an individualized review and assessment of all available grand jury minutes of [AUSA A] from the time when the prosecutor joined the U.S. Attorney's Office in 2007 to the present and in those cases where the prosecutor served as lead counsel." *See*, Gov't Unopposed Motion to Dismiss with Prejudice, *U.S. v. Ishkirat,* 25 CR 562,

Dkt. 65, p. 6. The results of that review have not been made public, and it is not now clear whether they ever will be made public. There is every reason to believe that misconduct before the Special June 2024 Grand Jury influenced the indictment of Uribe.

Second, even assuming AUSA A had no involvement in the grand jury presentation here, there is no reason to believe that the effect of the improper vouching and other misconduct on the Special June 2024 Grand Jury would be limited to grand jury matters at which AUSA A personally appeared. AUSA A appeared with a second AUSA when she made the statements set forth above. Her vouching undoubtedly impacted that grand jury's views of the strength of the government's evidence, even if presented by other prosecutors. The reality is that AUSA A's conduct left the Special June 2024 Grand Jury hopelessly tainted. At the very least, there is grave doubt that the decision to indict Uribe was free from the substantial influence of that misconduct.

Third, it is apparent from the *Rabbitt* matter that other AUSAs were present during the misconduct by AUSA A before the grand jury. That is almost certainly the case in other investigations before the Special June 2024 Grand Jury and other grand juries. Yet, it appears that the misconduct was never reported and was allowed to continue.

Fourth, the full extent of AUSA A's misconduct before the Special June 2024 Grand Jury will never be known without discovery and an evidentiary hearing. Per her own statements, AUSA A had developed a special, trusting relationship with those grand jurors. Moreover, there are documented instances of AUSA A discussing cases with grand jurors which are not transcribed but were picked up by audio equipment. *See*, *Ishkirat*, 25 CR 562, Gov't Mtn to Dismiss, Dkt. 65, p. 2 ("During the experienced prosecutor's *ex parte* contact with grand jurors, which is believed to have taken place without a court reporter present because the contact is not contained in any transcript, the prosecutor can be heard stating, in reference to a video, that she 'can prove this

case.' The prosecutor also told grand jurors as part of this exchange 'we don't catch the smart ones,' 'most of them aren't as smart as they think,' and 'the white-collar guys think they are the smartest in the world.'") And, there are documented instances of AUSA A discussing matters with grand jurors in the hallway with no recording whatsoever. *United States v. Ahmed,* 25 CR 321, Dkt. 131, pp. 2-3 (referencing "improper prosecutorial communications of a substantive nature with grand jurors outside the grand jury room" in the *Rabbitt* case).

Most importantly, there is possible misconduct and at the very least irregularities during the grand jury testimony heard in the Uribe case on October 9, 2025, by the Special June 2024 grand jury. On the same afternoon that gross misconduct and indoctrination were committed by AUSA A during the presentation of testimony on the "Broadview 6" case (*USA v. Rabbit, et al*., 25 CR 693), Victim A in Uribe's case testified with the assistance of a Mandarin interpreter. At some point during or after Victim A's grand jury testimony, the United States Attorney's Office deemed the certified interpreter's translation to be inaccurate. While there is an audio recording of the testimony, there is no official court reporter's transcript. However, there is a later FBI translation and transcript that the United States Attorney's Office has deemed accurate and tendered through discovery. Presumably, this subsequent translation and transcript was completed at the direction of the United States Attorney's Office.

These irregularities raise several questions. At what point during or after Victim A's grand jury testimony did the United States Attorney's Office believe that the certified interpreter's translation was inaccurate? Why did the United States Attorney's Office allow the testimony to continue? The post-grand jury actions by the FBI of retranslating and transcribing Victim A's testimony are troublesome, and do not cure the issue.

Thus, on October 9, 2025, on the same afternoon that AUSA A egregiously indoctrinated the Special June 2024 grand jury, that same grand jury also heard mistranslated questions and answers by Victim A in Uribe's case. The later FBI translation and transcript do not cure the gross error of the grand jury receiving mistranslated testimony. That bell cannot be unrung. On December 4, 2025, in the final Uribe grand jury session before the Special June 2024 grand jury, FBI Special Agent Christine Doyle tried to explain the translation issue, and then vouched for the credibility of Victim A's testimony, which is wholly improper.

Without discovery and an evidentiary hearing including witnesses, the full extent of the misconduct, as well as the dates it occurred, cannot be known. Improper discussions were had off the record and sometimes in the hallway. Only witness testimony can provide insight into those discussions which may well reach beyond what is currently known. Despite the United States Attorney's Office's remediation plan purportedly being in place for some time now, Uribe was never notified by that office that the grand jury in this case was the same tainted grand jury from the dismissed cases.

Based on what is currently known, the Special June 2024 Grand Jury was irrevocably tainted by government misconduct. And based only on what is currently known, that misconduct not only prejudiced Uribe personally, but was also widespread across multiple investigations and multiple grand juries. The indictment should be dismissed with prejudice.

If the Court is not inclined to dismiss the Indictment with prejudice, then discovery should be provided and an evidentiary hearing conducted. Details of the requested discovery and hearing are set forth below.

## II. LEGAL STANDARD

The Fifth Amendment mandates that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. The Fifth Amendment "presupposes an investigative body 'acting independently of either prosecuting attorney or judge.'" *United States v. Williams*, 504 U.S. 36, 49 (1992) quoting *United States v. Dionisio*, 410 U.S. 1, 16 (1973). The grand jury accordingly "must be free to pursue its investigations unhindered by external influence or supervision." *Dionisio*, 410 U.S. at 17.

Policing that principle, however, is difficult because the grand jury sits in secret, with no judge in the room, no defense advocate, and no contemporaneous check on the prosecutor (aside from other prosecutors). As the Third Circuit explained:

> [T]he prosecutor operates without the check of a judge or a trained legal adversary, and virtually immune from public scrutiny. The prosecutor's abuse of his special relationship to the grand jury poses an enormous risk to defendants as well. For while in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened.

*United States v. Serubo*, 604 F.2d 807, 817 (3d Cir. 1979).

Grand jury secrecy requires prosecutors to act with the utmost of integrity, honor, and decorum. A prosecutor is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935). Her duty, her obligation, before the grand jury is "not to inflame or otherwise improperly influence the jurors." *United States v. DiGrazia*, 213 F. Supp. 232, 235 (N.D. Ill. 1963) (Will, J., dismissing Indictment after conducting an

evidentiary hearing including testimony from the AUSA and FBI agents). She must likewise preserve the grand jury's "fairness, impartiality, and lack of bias," and must never "act in a way that overlooks inherent prejudice to the person under criminal investigation." *United States v. Gold*, 470 F. Supp. 1336, 1346 (N.D. Ill. 1979) (Leighton, J., dismissing Indictment after conducting an evidentiary hearing). Due to the secrecy of the proceedings, when these standards are breached and misconduct occurs, it is particularly devastating to the criminal justice system.

Misconduct is rooted in tactics aimed at manipulating an indictment. A "prosecutor should not make statements or arguments in an effort to influence grand jury action in a manner which would be impermissible at trial before a petit jury." *United States v. Gold*, 470 F. Supp. at 1351 (quoting Section 3.5(b) of the Standards, The Prosecution Function, adopted by the American Bar Association (1971)). Such tactics involve expressing personal opinions regarding the guilt of the accused (*United States v. Young*, 470 U.S. 1, 18 (1985)); vouching for the credibility of witnesses (*United States v. Robinson*, 485 U.S. 25, 33 n.5 (1988)); suggestion, insinuation, and assertions of personal knowledge about the accused (*Berger v. United States*, 295 U.S. at 88); presenting informal, unsworn testimony (*United States v. Hodge*, 496 F.2d 87, 88 (5th Cir. 1974); *United States v. Leeper*, No. 06-CR-58A, 2006 WL 1455485, at *3 n.2 (W.D.N.Y. May 22, 2006)); offering expert-type testimony regarding what is typical in a particular case (*Williams v. United States*, 757 A.2d 100, 106 (D.C. 2000)); inflaming the passions of the grand jurors (*DiGrazia*, 213 F. Supp. at 235; *United States v. Abbott Laboratories*, 369 F. Supp. 1396 (E.D.N.C. 1973)); depicting the accused as a bad person (*United States v. Hogan*, 712 F.2d 757, 761 (2d Cir. 1983)); developing an unnatural rapport with the grand jurors that leads to dependencies and risks manipulation (Fed. R. Crim. P. 6(e)(1), Advisory Committee Notes to 1979 Amendments; *United States v. Breslin*, 916 F. Supp. 438, 443 (E.D. Pa. 1996)); and providing misleading legal

instructions and mischaracterizations of the facts *(United States v. Udziela,* 671 F.2d 995, 998 (7th Cir. 1982); *United States v. Cerullo*, 2007 WL 2462111, at *2 (S.D. Cal. Aug. 28, 2007); *United States v. Stevens*, 771 F. Supp. 2d 556, 568 (D. Md. 2011) (dismissal warranted where prosecutor's erroneous instructions "[go] to the heart of the intent required to indict"); *United States v. Estepa,* 471 F.2d 1132, 1136–37 (2d Cir. 1972)). This particular grand jury proceeding is rare because, based only on information publicly available, virtually all of these instances of misconduct occurred. The cumulative effect of them is to create a biased grand jury and warrant dismissal of the indictment under the Court's supervisory power. *Samango*, 607 F.2d at 884.

A district court may dismiss an indictment for prosecutorial misconduct before the grand jury. As a general matter, dismissal requires a showing of prejudice: dismissal is appropriate "if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988); *accord United States v. Anderson*, 61 F.3d 1290 (7th Cir. 1995) (applying this standard to claims of prosecutorial misconduct before the grand jury); *United States v. Filer*, No. 19-cr-00565 (N.D. Ill. Jan. 14, 2025). Prejudice need not be proven to a certainty; grave doubt is enough. *Bank of Nova Scotia*, 487 U.S. at 256.

This Court clearly has the authority to dismiss the indictment based on prosecutorial misconduct in the grand jury. As Chief Judge Kendall explained when dismissing an indictment based on the prosecution's interference with the defendant's right to present a defense, the Court's supervisory authority provides ample power to dismiss in order to curb misconduct:

> The Court may dismiss an indictment on other grounds pursuant to its supervisory powers, such as when the government exhibits outrageous misconduct in prosecuting the indictment, causing prejudice to the defendant; such a dismissal is a prophylactic tool used to discourage future deliberate governmental

> impropriety. *See United States v. Derrick*, 163 F.3d 799, 807 (4th Cir.1998) ("[A] court's supervisory power cannot be exercised to dismiss indictments for government misconduct absent a showing of prejudice to the defendants."); *United States v. Samango*, 607 F.2d 877, 884 (9th Cir.1979) (quoting *United States v. Owen*, 580 F.2d 365, 367 (9th Cir.1978)) (internal quotation marks omitted) ("Under its inherent supervisory powers, a federal court is empowered to dismiss an indictment on the basis of governmental misconduct.")

*United States v. Linder*, 2013 WL 812382, at *30 (N.D. Ill. 2013)

The defense acknowledges that a dismissal with prejudice for misconduct in the grand jury is not the typical remedy. *See United States v. Slough*, 679 F. Supp. 2d 55, 61 (D.D.C. 2010) (collecting cases). But this is not a typical case. The record already demonstrates repeated misconduct across multiple cases, and the requested discovery and an evidentiary hearing with testimony from individuals in the U.S. Attorney's Office, including AUSA A, may well reveal more.

To avoid a dismissal with prejudice in grand jury misconduct cases, the government often relies on the Supreme Court's explanation in *Bank of Nova Scotia* that a dismissal is appropriate only "if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256–57 (1988) (adopting the standard from Justice O'Connor's concurrence in *United States v. Mechanik*, 475 U.S. 66 (1986)). The government then argues that a superseding indictment, presumably absent misconduct, cures any 'substantial influence' or 'grave doubt' concerns. But, *Bank of Nova Scotia* left open an avenue for dismissal with prejudice; that is, a history of repeated prosecutorial misconduct. "Finally, we note that we are not faced with a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment." *Id*. at

259, n.9. Multiple cases post-dating *Bank of Nova Scotia* recognize this as a possible basis for dismissal. *See, e.g.*, *United States v. Smith*, 2022 WL 1053263 at *1 (2d Cir. 2022) (summary order) (citing *United States v. Percoco*, 13 F.4th 158 (2d Cir. 2021) rev'd on other grounds) ("This Court may dismiss an indictment for prosecutorial misconduct as "an extraordinary remedy ... pursuant to [its] supervisory power ... if the grand jury was misled or misinformed, or possibly if there is a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process."); *United States v. Brito*, 907 F.2d 392, 394 (2d Cir. 1990); *United States v. Felton*, 755 F.Supp. 72, 74 (S.D.N.Y. 1991); *but cf. United States v. Walters*, 910 F.3d 11 (2d Cir. 2018).

Although dismissal with prejudice is rare, federal appellate courts have affirmed it as a sanction for prosecutorial misconduct in a range of contexts where the misconduct caused harm that no lesser remedy could undo. *See United States v. Chapman*, 524 F.3d 1073, 1085–87 (9th Cir. 2008) (affirming dismissal with prejudice as a sanction for "flagrant" prosecutorial misconduct involving the suppression of more than 650 pages of *Brady* and *Giglio* material); *United States v. Bundy*, 968 F.3d 1019, 1041–45 (9th Cir. 2020) (affirming dismissal with prejudice where the government's "reckless disregard" of its Brady obligations and the prejudice the defendants would suffer on retrial warranted dismissal of the indictment); *United States v. Stein*, 541 F.3d 130, 136 (2d Cir. 2008) (affirming dismissal with prejudice of indictment against thirteen defendants where the government's interference with defendants' Sixth Amendment right to counsel was such that "no other remedy [would] return defendants to the status quo ante").

## III. ARGUMENT

### A. The Indictment Should Be Dismissed Because the United States Attorney's Office's Misconduct Compromised the Independence of the Special June 2024 Grand Jury

**and Creates Grave Doubt That the Uribe Indictment Was Free From Its Substantial Influence.**

The grand jury "belongs to no branch of the institutional Government, serving as a kind of buffer or referee between the Government and the people." *Williams*, 504 U.S. at 47. Its constitutional value depends on its independence: the Fifth Amendment's guarantee "presupposes an investigative body acting independently of either prosecuting attorney or judge." *Id.* (*quoting Stirone v. United States*, 361 U.S. 212, 218 (1960)). When a prosecutor's misconduct overbears that independence, the resulting indictment is not the product of an independent grand jury at all, and it must be dismissed. *See United States v. McKenzie*, 678 F.2d 629, 631 (5th Cir. 1982) (an indictment may be dismissed only where "prosecutorial misconduct amounts to overbearing the will of the grand jury so that the indictment is, in effect, that of the prosecutor rather than the grand jury").

Improper vouching strikes at that independence directly. When a prosecutor stakes her personal credibility on the strength of the charges—as the AUSA did here in telling the grand jury "you know me and you trust me" and "I don't charge people unless I'm absolutely sure"—she substitutes her own assurance for the grand jury's independent assessment of probable cause. That is precisely the vice the vouching prohibition guards against. Dismissal is warranted where "the grand jury has been overreached or deceived in some significant way" and the prosecutor's conduct "significantly infringed upon the ability of the grand jury to exercise its independent judgment." *United States v. Cederquist*, 641 F.2d 1347 (9th Cir. 1981). This case is a far cry from the permissible advocacy recognized in decisions like *Filer*, where the prosecutor merely used the word "fraud" to describe the offense charged and commented on evidence actually presented. *See Filer*, No. 19-cr-00565. Here, AUSA A did not comment on the evidence; she vouched for herself,

asking the grand jurors to indict because they trusted her personally and because she personally was "absolutely sure."

The misconduct here is also more corrosive than a single improper remark because it was historical and cumulative. The misconduct began *prior* to the misconduct described above in the *Rabbitt* case. It infected the grand jury at an as-yet-unknown time in the past but definitively resulted in an improper relationship between AUSA A and the grand jury. The AUSA's statements reveal that she had cultivated an ongoing bond of trust with the Special June 2024 Grand Jury—one in which the jurors had come to rely on her personal representations across matters, had "asked [her] before 'Well, what about this person?,'" and had received her assurance that she would not charge without being "absolutely sure."

The improper relationship and assurances that charges would not be brought without absolute certainty would also not be limited to AUSA A. She was not alone when she made her representations to the *Rabbitt* grand jury, and she made no effort to suggest that the grand jurors should view other AUSAs differently than they viewed her. A grand jury that has been conditioned to defer to the prosecution's certainty is no longer the independent "buffer" the Constitution requires. *Cf. Serubo*, 604 F.2d at 817 (the prosecutor's "abuse of his special relationship to the grand jury poses an enormous risk to defendants"); *see Hodge*, 496 F.2d at 88 (informal, unsworn statements "from the mouth of the prosecutor" are "interdicted by the Fifth Amendment"). Because this conditioning went to the grand jury's institutional capacity for independent judgment rather than to the evidence in any one case, its taint is not confined to the cases that AUSA A personally presented. It reaches every indictment returned by that body while the improper relationship persisted—including the indictment against Uribe.

By analogy, this is the kind of case in which the "structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair," such that prejudice may be presumed. *Bank of Nova Scotia*, 487 U.S. at 256–57 (recognizing race and gender discrimination in choosing grand jurors as *exemplifying* structural error but not precluding other possibilities). But, even if the Court does not find structural error here, there is at least "grave doubt" that the decision to indict Uribe "was free from the substantial influence" of the United States Attorney's Office's improper vouching and cultivated trust. *Id.* at 256. The same grand jury that indicted Uribe was subjected to misconduct that the Government concedes tainted two other indictments returned by that body. And the AUSA's own words establish that her improper vouching began sometime in the past. A grave doubt finding is permissible on these facts; discovery and an evidentiary hearing may well make the grave doubt all the more apparent.

The Government cannot answer that doubt by invoking *Mechanik*. That line of authority holds only that a subsequent petit-jury guilty verdict renders certain grand-jury errors harmless. *See Anderson*, 61 F.3d at 1297 (relying on the petit jury's verdict). Uribe has not been tried. That rationale has no application before any verdict; the pretrial standard of *Bank of Nova Scotia* therefore governs. *Bank of Nova Scotia*, 487 U.S. at 254–56; *accord United States v. Navarro*, 608 F.3d 529, 539 (9th Cir. 2010) ("On appellate review of the case after conviction, the *Mechanik* standard applies").

**B. Uribe Has Suffered Prejudice**

Uribe has been in custody for nearly nine months. He has lived under the weight of a federal indictment for nine months, with the attendant reputational, financial, and personal consequences that follow from being publicly accused of a federal crime. Uribe has incurred legal

fees and expenses and continues to do so leading up to a trial beginning on September 8, 2026. This is prejudice that the Third Circuit warned was the result of misconduct in the grand jury:

> [T]he handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened.

*Serubo*, 604 F.2d at 817.

None of that harm can be undone; "a later dismissal or acquittal can never undo" the impact of the indictment that was actually returned. *Id*.

### C. Dismissal with Prejudice is Warranted by the Widespread Misconduct

As the five cases listed in the introduction already make clear, based solely on what is already known, the grand jury misconduct in this district spans several cases, and is so systematic and pervasive that it raises a substantial and serious question about the fundamental fairness of the process which resulted in Uribe's indictment. *See*, *Bank of Nova Scotia*, 487 U.S. at 259, n.9 ("Finally, we note that we are not faced with a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment.") The misconduct in this case was not limited to a single case. The misconduct was not limited to a single grand jury. The misconduct appears to have gone back years. The misconduct sometimes occurred in the grand jury room but off the record. The misconduct occurred sometimes in the hallway. The *Bank of Nova Scotia* judges imagined pervasive misconduct that would not require a showing of specific prejudice. It is hard to imagine that they imagined this.

To date, the defense is not aware of specific misconduct by prosecutors other than AUSA A. But, she was not alone when she engaged in misconduct before the *Rabbitt* grand jury, and she

was undoubtedly not alone for every instance of misconduct during other grand jury presentations. Maybe the U.S. Attorney's Office's Phase II Remediation Plan will one day make clear whether there was simply a failure to report misconduct, or active misconduct by other AUSAs. For purposes of this motion, the misconduct is sufficiently widespread to meet the *Bank of Nova Scotia* exception.

## IV. In the Alternative, the Court Should Order Disclosure of the Grand Jury Materials in the Investigation that Led to the Indictment Here, All Records of AUSA A's Grand Juror Interactions Before the Special June 2024 Grand Jury, as well as the Results of the Phase II Remediation Plan and Conduct an Evidentiary Hearing.

If the Court is not prepared to dismiss with prejudice on the present record, it should order the Government to produce the materials necessary to resolve the question and conduct an evidentiary hearing. The defense is entitled to disclosure of grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). Courts evaluate such requests under the "particularized need" standard, balancing the need for disclosure against the interest in grand jury secrecy. *See Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 222–23 (1979); *United States v. Puglia*, 8 F.3d 478, 480 (9th Cir. 1993) ("Puglia must show a particularized need for the review to overcome the presumption of secrecy embodied in the grand jury process."). That interest wanes as the proceedings recede and the traditional justifications for secrecy fall away, so that "as the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification." *Douglas Oil*, 441 U.S. at 223.

Uribe readily satisfies that standard. He does not offer conclusory or speculative allegations of misconduct; he points to documented, admitted, and adjudicated misconduct by the United States Attorney's Office before the same grand jury, together with a prosecutor's own statements indicating that her improper conduct before that body predated the documented episodes. That is

a powerful showing that a ground may exist to dismiss the indictment. In *United States v. Comey*, 1:25-cr-272-MSN-WEF (E.D. Va.), the court ordered full disclosure of grand jury materials on a comparable record—prosecutorial irregularity coupled with a transcript that "likely do[es] not reflect the full proceedings." *Comey*, at Dkt. 191, p. 23. A similar incompleteness is present here, where AUSA A's own admission and the incomplete transcript show that portions of her remarks were never recorded. *See* Fed. R. Crim. P. 6(e)(1).

In order to provide further support for this motion and to establish a "history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment," *Bank of Nova Scotia*, 487 U.S. at 259, the defense requests the production of: (1) the complete transcripts (including minutes and colloquy) of the proceedings before the Special June 2024 Grand Jury related to the indictment of Uribe; (2) the complete transcripts (including minutes and colloquy) and all audio recordings of every appearance by AUSA A before the Special June 2024 Grand Jury; (3) the complete transcripts (including minutes and colloquy) and all audio recordings of every appearance of any AUSA before the Special June 2024 Grand Jury relating to the Uribe investigation and indictment; (4) all records—including transcripts, audio recordings, notes, memoranda, and correspondence—reflecting any communication between any AUSA (or any member of the prosecution team) and any grand juror of the Special June 2024 Grand Jury, whether inside or outside the grand jury room; (5) any record identifying the prior occasion(s) on which the AUSA told the Special June 2024 Grand Jury that she does not seek charges unless she is "absolutely sure" or words to that effect; (6) the complete transcripts (including minutes and colloquy) and all audio recordings of every appearance by AUSA A before any grand jury; (7) any internal communications of the U.S. Attorney's Office for the Northern District of Illinois related

to complaints, notifications, or discipline for misconduct in the grand jury by AUSA A; and (8) the complete results of the Phase II Remediation Plan conducted by the Office of the United States Attorney.[1]

An attorneys'-eyes-only limitation fully protects any remaining secrecy interest while permitting the adversarial testing the Fifth Amendment requires.

**V. In the Further Alternative, the Court Should Also Hold an Evidentiary Hearing.**

Because the transcribed record is admittedly incomplete, disclosure alone may not resolve what AUSA A said to the Special June 2024 Grand Jury, and when. The Court should hold an evidentiary hearing with witnesses, including AUSA A, to determine (1) the prior occasion(s) on which AUSA A vouched to this grand jury including whether any such statement was made off the record or captured only on audio; (2) the content and timing of any unrecorded hallway and *ex parte* communications with grand jurors; (3) whether any such communications preceded or accompanied the Uribe presentment; and (4) whether prosecutorial misconduct before the grand jury was indeed systematic and pervasive as discussed in *Bank of Nova Scotia*, *supra*. Such a hearing would be directed to the prosecution and to the completeness of the record—not to the grand jurors' deliberative mental processes—and thus raises none of the concerns that counsel against probing a grand jury's reasons for indicting. A hearing would also provide evidence of the

[1] As set forth in its motion to dismiss the *Ishkirat* Indictment, the government's Phase II Remediation Plan intends to review not only all of AUSA A's presentations to the grand jury, but the presentations of other AUSAs as well – it "contemplates the proactive review of a voluminous category of cases to (i) ensure the absence of grand jury irregularities in the cases charged by indictment by the U.S. Attorney's Office for the Northern District of Illinois;" and involves an "individualized review and assessment of all available grand jury minutes of [AUSA A] from the time when the prosecutor joined the U.S. Attorney's Office in 2007 to the present and in those cases where the prosecutor served as lead counsel;" and, it includes "a review that ensures that Assistant U.S. Attorneys who have appeared before the grand jury in the Northern District of Illinois during the relevant time frame and/or as otherwise being defined, have acted in accordance with law and consistent with the highest ethical standards." *Ishkirat*, 25 CR 562, Dkt. 65, p. 7.

widespread nature of misconduct before the grand jury, whether other AUSAs engaged in such misconduct, as well as whether any misconduct was reported and actions taken.

The need for a hearing follows from a basic principle of fairness: a defendant should not be made to bear the consequence of the Government's own failure to create a complete record. Rule 6(e)(1) requires that all grand jury proceedings, except deliberations and voting, be recorded; off-the-record communications between the prosecutor and grand jurors depart from that command and deprive the defendant and the Court of the record needed to assess their influence. *See* Fed. R. Crim. P. 6(e)(1). Here, the full information needed to measure the influence of the United States Attorney's Office's vouching—what was said, and when—is missing from the record because of the Government's noncompliance with Rule 6(e)(1). The Government should not be permitted to convert its own incomplete record into a shield. At a minimum, Uribe is entitled to a hearing to complete the record.

## VI. CONCLUSION

For the foregoing reasons, Uribe respectfully requests that the Court dismiss the indictment with prejudice. In the alternative, Uribe asks that the Court (1) order the Government to produce the grand jury materials and records requested above, and (2) hold an evidentiary hearing on this subject.

Respectfully submitted,

/s/ Michael F. Clancy

MICHAEL F. CLANCY
53 W. Jackson Blvd., Suite 1401
Chicago, IL 60604
(312) 427-0288